Our next case is number 2010-1456, 1458 I'm sorry. MR. CAMPBELL In the meeting of your honors. MR. STEWART You may proceed. MR. CAMPBELL Thank you. I may please the court. At trial, August convinced the jury and the district court that the 6298 patent solved the problem with prior art strobes so that they could be used effectively in wafer inspection systems. But they did so by arguing a different invention than what was claimed, and also by mischaracterizing the prior art. THE COURT Could I understand what your position is? Do you read these claims as covering inspection of a bare wafer or only a wafer which has dye on it? MR. CAMPBELL The specification is directed to second optical inspection. The claims, however, THE COURT Second optical inspection, which is wafers that have something on them. MR. CAMPBELL Wait, wait, wait. You can't talk over me. Which have dye on them, right? MR. CAMPBELL Yes, your honor. So yes, the claims are directed to second optical inspection, wafers that have something on them. THE COURT So you're not appealing that portion of the district court's order that rejected your proposal that the wafer could be blank? MR. CAMPBELL Yeah, I don't think our position was ever, your honor, that the wafer had to be blank. There was some circuitry on it. The issue on the claim construction with respect to wafer was whether or not it was the any part thereof aspect of the construction of the wafer. THE COURT Well, but no, you asked the judge originally to construe the claim to not require circuitry on it, to not be processed, and the judge rejected that, but you're not appealing that piece.  CAMPBELL That's correct, your honor. THE COURT Okay. On your notional wafer concept, isn't your notional wafer concept actually inconsistent with your argument to the trial court that a wafer can't be a die? I mean, why couldn't a die, a single die, be cut, as long as it was on a substrate, away from a wafer and constitute a wafer under your current theory? MR. CAMPBELL I'm not sure if I fully understand the question, your honor. THE COURT You argued to the trial court that a wafer can't be a die. MR. CAMPBELL Correct. A single wafer. THE COURT But now you have this notional wafer concept, and isn't that inconsistent with what you argued below? In other words, couldn't a single die, if it was on some kind of a substrate, be a wafer under your current theory?  CAMPBELL Okay, your honor, so it's clear. CAMPBELL's position isn't that a wafer could be a single die, and we didn't raise the notional wafer concept, so I'm clear with the question. The issue was, at trial, there were, what is a wafer? And the issue is, if you have a wafer, some physical substrate, if it has two or more die on it, it could be a wafer. I think there was not a dispute about the issue.  CAMPBELL But it can't be two wafers. CAMPBELL But at the same time, so having to find some substrate as the wafer for the purposes of the claim, you cannot go back to that particular wafer and now start notionally dividing it with groups of two or more dies to call those wafers. MS. GOTTLIEB You're not a plurality of Mr. Kaplan's, are you? MR. CAMPBELL That's correct, your honor. MS. GOTTLIEB That's your argument, in a nutshell. MR. CAMPBELL That is exactly it. And the issue is – MS. GOTTLIEB But you did argue to the district court that a wafer can't be a die, correct? MR. CAMPBELL Yes, your honor. There was a clarification in the claim construction before we went to the jury instruction to make it clear that a wafer couldn't be a die, because wafer and die are different terms as used in the claims and throughout the patent. That is correct. MS. GOTTLIEB But under your current theory, that all it has to be is some other separate physical entity, couldn't that separate physical substrate have one die on it?  CAMPBELL A particular substrate that has one die on it? That could be a wafer. I mean – MS. GOTTLIEB You just wanted to make sure that it was clear that die and wafer are not interchangeable, it's not exactly the same thing. MR. CAMPBELL Right. The issue is that when you have – when you go through this process, it's laid out in the briefs, when you do inspection of a wafer that has – whether it has a lot of die or only a few die on it, there is some physical wafer or substrate that is being inspected. And having identified whatever it is as a wafer, whether it is a partial or broken pattern, there's a whole laundry list in the claims and the spec that say what a wafer could be. But having denominated something a wafer, you cannot go – MS. GOTTLIEB Did you ever propose a construction to the trial court that said that it had to be a separate physical entity? MR. CAMPBELL Yes, Your Honor. I believe that is implicit – MS. GOTTLIEB Show me where in the record it – the briefs looked at the transcript. I don't see it. MR. CAMPBELL I think if you go back to the original claim construction – the claim construction briefing – I'll pull that site up. But, Your Honor, the ultimate construction that went to the judge, which was rejected by CAMTEC for the Markman hearing, was a thin slice of semiconductor material with some other circuitry on it. The competing construction from the plaintiffs had to do with – was essentially similar with circuitry on it, but – or any part thereof. And the dispute at the claim construction process was the – or any part thereof – aspect. And I would submit that the thin slice of semiconductor material, which was CAMTEC's proposed construction for the Markman, could be – that is a physical discrete substrate. There is really no distinction. We're really just characterizing what the original construction was. So I think if you go back to the briefs, I'll get to the site in a second. But a thin slice of semiconductor material – in fact, it's even cited in the Markman order. So I'll point to – it's a record 7900 – 7900 where it says a wafer is a thin slice of – a thin semiconductor slice on which matrices of microcircuits can be fabricated or which can be cut into individual die fabricating single transistors and diodes. There's nothing there that says – I think that is a physically discrete substrate. It's a thin slice of semiconductor material, whether it was a whole wafer – as people understand what's a whole wafer – broken, partial, it's completely – But when the court adopted any part thereof, your only response to that is that's wrong because it can't be a die. Isn't that right? I think what it – there was – is that – when we asked – there was the clarification and the court granted the clarification that a single die isn't a – is not a wafer. I think that was to make clear that wafer and die weren't the same because there are other issues in the case that wafer and die are used differently and have different meanings. So during that clarification, during the whole claim construction process, which is, you know, under your local rules, it's very drawn out, you never once proposed a construction that asked the trial court to instruct the jury that it has to be a separate physical piece, which is what you're proposing now. Well, those expressed words were not used, Your Honor. That I would agree with, but I would disagree that the construction that we proposed, which I just read, the thin semiconductor slice, and even with the clarification that a wafer is not a die, is in essence – it is a physical substrate. There is nothing here which says you can go back and take whatever that wafer is and then say having defined it, and now we're going to call it four, and that's exactly what happened at the trial. The expert witness for August showed a picture of a wafer and said, well, this is a wafer, and then they divided it into four quadrants and said it's also four wafers, and he testified it could be as many wafers as you wanted it to be, as long as it was two or more die. But I think the clarification of wafer and die had to go with confusion over terms that were used in the claim. I don't think in any way it reaches the issue of – Did you object to that expert testimony on grounds that it was inconsistent with the claim construction? That I would have to check. I know – I'd have to check if there was a particular objection made at that time. There was J-Mall motion practice after the trial where these issues were raised, and the – Right, but you can't raise a construction for the first time in J-Mall, so I think we need to put that aside. The question is, to what extent was this argument presented to the jury – presented to the court at the time – either before trial or even during trial? But is the question as to which – the argument being that a wafer is a single – is a physically discrete substrate? Yes. Your Honor, like I said, those terms weren't used, but I would – Counsel, I'm going to help you out because I don't want this to take up all of your argument. Why don't you point to the rebuttal brief of claim construction that you filed. I don't know where it is in the appendix, but page 10 of your rebuttal brief would be – Yeah, there's a – What I want us to focus on, and in page 10 of your rebuttal brief, and I – do I understand the process right from claim construction that the initial briefs were filed simultaneously and the rebuttal briefs were filed simultaneously? That is correct, Your Honor. So this would have been your first opportunity to respond to the plaintiff's proposed claim construction because the initial briefs were simultaneous and the new briefs were simultaneous. Is that right? This is your first opportunity to respond. That is correct. And – So on page 10, why don't you tell me what at the top of that page 10 you think – Do you have – Bottom of page 9, top of page 10. Thank you. Do you want the rebuttal construction brief, Your Honor? That's – Okay. I think you might want to look at. I don't – You don't have it handy? I don't – Do you want to borrow my copy? No, no, no, Your Honor. It's highlighted. It might help. There is one sentence in there. But you also had the claim chart well before the briefs were ever submitted. Right. The – If you're talking about the claim chart that's a JA 7900, what puts forth our position, that is – yes, that issue was raised. And at the markment here, and I know the transcript – there was a request for the transcript yesterday. There – it was the issue of the – any part thereof language to treat an aparted wafer as a wafer. This was in the transcript on page 59 at lines 9 to 14. It was expressly argued – Let me understand two things. First of all, did the district court find that you had waived this argument? No, Your Honor. We've never – I'm not aware of that at all. Does the other side – That's never been raised. Does the other side in its brief contend that you waived this argument? They did raise that issue in the brief we responded to in a footnote in our gray brief. And the issue – the reason we responded to it in a footnote is that – But wait, I'm not understanding how – a waiver determination has to be made by the district court. We don't reach out and make waiver determinations when the district court has considered and decided the issue, do we? No, if it's been decided, it's a – And it was decided. I mean, that's the basis for the decision here, right? De novo. Correct? That's correct, Your Honor. All right. There's a couple other things. I only have a couple minutes here. I just want to – I want to ask you a couple questions about the invalidity issues. Sure. First, with respect to the jury instruction about the on-sale bar. Suppose you're correct that the jury instruction was wrong. Why isn't that harmless error since this earlier embodiment didn't use strobing and          I'm not sure. I'm not sure. I'm not sure. I'm not sure. I'm not sure. I'm not sure. I'm not sure. I'm not sure.   Can you deal with any limitations? Your Honor, there are two reasons that it is relevant and important. Number one is that the NSX-80 is similar to the Chao reference, which was submitted. It is a stop and start system. It does patterned wafer second optical inspection. It doesn't use strobing, right? It does not use strobing. So how could it satisfy the claim limitations if it doesn't use strobing? Your Honor, the Dippendotz case, it can be used in a – a 102 reference can be used in a 103 combination, and it would have been combined with the Moriah patent that was also used, and the reason it's important is that the NSX-80 was the plaintiff's own device. It was their own system, and I think that would – that would have been an important issue for the – for the jury. In addition, there was an inequitable conduct defense that was never reached because the jury found that it wasn't prior art, so the inequitable conduct. So we think it's an – it was a – the jury instruction was an important problem. Okay. Great. So let me turn to the – to the obviousness question. Your argument is that you should combine Chao and Moriah, and my understanding is that those – both of those patents deal with the inspection of wafers rather than dye, correct? That is correct, Your Honor. So what you – in order to prevail on obviousness, you would have to show that it was obvious to someone skilled in the art to transfer the technology for wafer inspection to dye inspection, correct? No, Your Honor. The claims that issue – first of all, the claims of the patent in suit, the 1698 patent, talk about inspecting wafers, number one. Okay. But that – wait. I thought – that was why I asked you the question in the beginning, whether you agreed that these claims were limited to this second-stage inspection of dye, and I thought you said yes, and now you're making a different argument that the claims include wafer inspection, pure wafer inspection as well. Oh, I'm – maybe I misunderstood. I'm not saying that the claims are directed to bare wafer inspection. The claims of the patent in suit are directed to patterned wafer inspection. Our positions are directed to poorly performing. Okay. So in order to combine Chao and Moriah, which deal with wafer inspection rather than dye inspection, you'd have to have someone skilled in the art say that a process for inspecting bare wafers would also apply to dye, right? I'm not sure if that's exactly correct, Your Honor, because the Chao patent – so I'm clear that the Chao patent describes inspecting patterned wafers, which have dye on them. Okay. But Moriah doesn't, right? It does not. But, Your Honor, the purpose of the Moriah patent is that it teaches Strobing to take a wafer inspection system that is stop-start and make it into a continuous system. Fair enough. And that's – But Moira is dealing with bare wafers, so in order to combine it with Chao and apply it to dye inspection, you'd have to have somebody say, well, it was obvious to do that, right? Well, I think the file wrapper of Chao itself, there was rejection of the Chao patent over Moriah, and so the Patent Office found that those two patents were in the same field and they would be combined. And they're both for wafer inspection. But my problem is you didn't have any expert testimony saying that someone skilled in the art would know to take Moriah dealing with the inspection of bare wafers and apply that to the inspection of dye. There was testimony, Your Honor, from Dr. Adler. I'd appreciate it if you could show me where, because I looked for it more accurately. I think in terms of the joint appendix, it's 65-25-2-31. Which volume is this? That would be volume 4, I believe. No, it's volume 3. Volume 3? Is that right? 65-25-3. So that is the range in particular. No, I'm sorry. Volume? Volume 3. Volume 3. Page 65, or Chao 65-25-3-1 is the range. My pages don't seem to have the transcript number on them. At the bottom. I see. What is the number again? 65-25, Your Honor. Okay. Okay. Your Honor, I'm about to run out of time. Don't worry about it. Where does it say this? If you look on page 65-30, lines 6-18, this is all questioning of Dr. Adler in this range. So where does he say that someone skilled in the art would? Page 65-30. I think the questioning that starts on line 6 of page 65-30 goes to the combination of why you would combine Chao and Boraya. This was Camp Tech's expert. What line? I'm sorry. The question starts on line 6, Your Honor, and the answer goes down to line 18. Yeah, but what's missing there is this recognition that you were transferring something from bare wafer inspection to dye inspection. Okay. Your Honor, I'm not sure that that particular testimony was offered because the Moriah patent was never relied on or advanced for the purpose of taking the bare wafer inspection technology. It was for the point that wafer inspection could be sped from stop-start to become continuous by the use of strobing. It will be highlighted in a brief some of the reasons for that, including some sections from the Moriah patent. Okay. I think we've got the point. We'll restore your rebuttal time. Okay. Thank you, Your Honor. May it please the Court? Mr. Phillips? Yes, go ahead. Mr. McDonough. Thank you. But on the waiver issue, I'd like to go to that. The waiver that we raised in our brief is that this issue of error that Cantek is now claiming was never raised before the district court with respect to the waiver issue. But the district court didn't find any waiver, right? That's right. And the district court decided this issue that's being addressed now, right? Well, the waiver we're talking about is waiving this as an appeal issue. So the district court would have had a chance to weigh in on that. What we're saying under, for example, the Interactive Gift Express case, it says that if at the court below, you don't raise an issue where you propose a change in the scope of the claim limitation on appeal, but you didn't raise that change in scope. Right. I'm confused because I thought that the district court had addressed this very issue and rejected the notion that it had to be separate. And specifically found that it was appropriate to say that you could have separate wafers in a single physical structure. Well, what the district court did, not exactly, what the district court did is they didn't add the any part thereof of a waiver. That Cantek originally sought to have that whole unfinished wafer that could be cut, which was very limiting. The court rejected that. The specific error, as I understand what they're really raising on appeal here, is that any part thereof should have said any physically discrete part thereof. Well, that would be one way of addressing it. But it seemed to me that the district court is specifically holding that a single wafer could be multiple wafers and decided that was appropriate. Why isn't that before us on appeal? Well, they never told the district court that saying any part thereof isn't sufficiently limiting because you need to indicate that it has to be physically discrete as opposed to multiple sections of a single wafer. There is one sentence in their rebuttal brief, though, where they point out that if the trial court reaches this conclusion, it could result in this infringement theory that apparently you did rely upon the trial. Well, it was kind of, I think, the wafers equals dies or something. They certainly didn't bring up this concept of physically discrete, though, even in that one sentence. Well, no, they say, moreover, plaintiff's proposed construction of wafer to include any portion thereof renders the claim language underlining the word plurality. Plurality of wafer is ambiguous and indefinite. What does the plurality of wafers mean under plaintiff's definition? Well, then, two die on the same wafer would qualify as a plurality of wafers. So would two circuits on one of those die? And so on. This effectively and improperly reads out the requirement there be a, quote, plurality of wafers. It's not even just one sentence. It's an entire paragraph. There's actually two more sentences. I'm going to stop now, though, that are pointing out that adding the specific language, any portion thereof, would result in a single wafer constituting a plurality of wafers. And they point out that that would be wrong. They have something in the ballpark, but they are certainly presenting it very differently here on appeal with the physically discrete issue. But maybe what I can do is just turn to why the construction of the district court was right in the first place. And there's a couple of big reasons for that. One is the preamble of the claims themselves specifically lists the sort of things that are wafers. And they include broken wafers. Broken suggests physically separate. It does. Sawn wafers, that does as well. But it does go to this issue, though, of how could you have multiple wafers in a single whole wafer. A sawn wafer, a broken wafer, could be broken in two. It used to be one wafer, and now it's two wafers. It could be, but it doesn't suggest that it is before it's broken. It does. You have another area then, too, though. That's the dives. That's one of the explicitly listed examples of wafer in the preambles of the claims, dives. And the specification can be cut separately, but the specification also describes dives as dives that can be cut. So they are dives. You call them dives when they're on the wafer. Hold on, though. One thing I want to make sure of is when it says dives, it's talking about die on wafer, right? Like the die doesn't exist separate from the wafer. You can cut a wafer so small so that you only have a die. It's like the die is the cheese and the wafer is the crust on the pizza. You've still got wafer underneath the die. You still have wafer. So when you put it on the visual inspection device, it's not just a die. It's a die sitting on top of a tiny little piece of wafer, right? Am I understanding the facts right? Sure. Well, let me help you there. The wafer fabricates. It could be hundreds of die on a single wafer. It's like all these little boxes like on a checkerboard. You can call them die then, but they're also called die when you actually saw them up into pieces, and then they're a bunch of separated squares. But there's still wafer underneath them. Well, no. There's no wafer anymore. They're in separate pieces. Wait, wait. They peel them off? Because the die is placed on top of the wafer. Well, it's made into it, but when they cut it, they cut the whole thing all the way through the sandwich there. Sure, so you still have the bread. No, all the way through the sandwich including the bread. You're actually cutting it in its entirety into separate pieces. There isn't a pizza crust left behind. You're cutting that pizza into discrete pieces, and each slice of pizza goes separately. That's a die. I think you're saying the same thing. There's still crust under the slice of the pizza, right? Well, no. When you cut them up, you take them away, and there's no crust left. There is no underlying substrate left behind. There's no crust left on the table, but it's following the genes. Obviously, I've used the analogy that's getting us all off in a direction here. The list of preamble does include die and gel packs in these separate packages. You can actually separately fabricate them and put them into these little packages. The point of the claim language, though, it's very clear to one of ordinary skill. You've got a wide range of things that come within the definition of wafer. The other aspect of that is in the specification, the preferred embodiment, because what this issue is about and why CamTech wanted this is because they wanted to say we only create our model by looking at multiple whole round wafers as opposed to multiple parts of a single wafer. Well, the preferred embodiment of the patent talks exactly about what CamTech does as the way to do this, to take a single wafer and grab die off of different parts of it. That's how you get that cross-section of die you use to create the model. And it talks about you can use as few as two die to create that model, preferably 10 or 20 and the more the merrier, but you only need two. And when you actually read the specification, it's grabbing... The problem is that the claims talk about a plurality of wafers, so you've got to find more than one wafer to find infringement. And so you've got to read that consistent with the preferred embodiment and that long list of things in the preamble to say you're grabbing it from different parts of a wafer. I certainly appreciate your acknowledgment of our canon of claim construction that says you shouldn't read out the preferred embodiment, but isn't there another patent here that actually says the words plurality of dies and wouldn't that claim and that patent expressly read on the preferred embodiment? I guess my point is not every single claim in a patent or a family of patents has to cover every single embodiment. But this issue is specific to the training issue, and that is at issue in the claims of this patent and how you create for visually inspecting, for training purposes, a plurality to get that model. So we are talking about this issue, so it's central to the preferred embodiment that describes getting multiple dies from a single wafer. Well, it's certainly the same issue as the preferred embodiment, but isn't the preferred embodiment covered under the other claim that says plurality of dies? You're talking about the other patent now? Sure, but it's the same specification. It's parent and child, so it's identical spec. The other patent goes to some different issues. It goes more related to the algorithm of how you come up with the inspection. It doesn't go into the strobing and continuous motion. It's really a pretty different animal. I'm not understanding how this description of the preferred embodiment is inconsistent. It talks about making inspection using a single wafer, right? Yes, well, it talks about training using a single wafer. Yeah, well, but whatever specification says, the claim says a plurality. You can't argue that because there's a single wafer embodiment in the specification that we weed out the plurality requirement in the claim language, can we? Well, but it's together with that preamble, though, that specifically says a wafer includes dies. And so when you have a wafer that's got hundreds of dies, and the preferred embodiment in the specification says you can take some dies from this part of the wafer and some dies from another part of the wafer, it's all consistent. I don't know about any one of them all by themselves whether it's enough to carry the day, but the preamble together with the preferred embodiment certainly amply supports what the district court did here. And really, the one sentence they rely on in the specification, they take out of context. They've got a sentence in there that talks about using a pool of wafers. But when you look at the context of that, the whole sentence there that's at column 14, part of a paragraph that binds 5 to 17 of the patent, that's at appendix 7485, the whole sentence talks about, in either case, this is then repeated for a plurality of known good die or wafers. As viewing of a pool of wafers, it's necessary to form a model of a good die. The last half they cited, they left out the first half of the sentence where it talks about using known good die or wafers. Clearly, that's communicating a one-of-ordinary-still. You look at individual die that you can pull off of a single wafer or use multiple wafers. It's got that either-or in the one sentence that they use to support their position on this. So the district court read this whole thing as a whole with the help of the expert testimony and said that it is what these claims mean. It is consistent with the preferred embodiment to say that you can capture dies that you've grabbed from different parts of a single wafer and still create a training model that works fine, that's exactly what this patent contemplates. That's not the only part of the spec that CAMTC relies upon. There's a variety of portions of the spec that they point to that relate to the handling of wafers. So you say there's only one portion of the spec, but there are several others that they also point to, do they not? Well, on the embodiment issue, this is what they refer to, but maybe you can refresh my memory on what other sections you might be concerned about. Well, they pointed out that the specification on a number of occasions talks about the fact that the wafers had to be moved, the wafers had to be handled, that the entire mechanism contemplated a movement of a wafer. That's true. In terms of the inspection process, you're moving multiple wafers through, that's the whole point, is to move these wafers through quickly. But in the training process, I don't think they cited anything specific to the training process, which is what we're really talking about here. They talked about, oh, bring a second wafer in and now do some more training based on that second wafer, except for that one sentence that I mentioned. So what I was talking about was specific to the training issue. So your argument is that on the training issue, because of the embodiment that you point out, that you can look at various portions of the wafer and then the inspection then turns to looking at numerous wafers to compare it to that? Right. You look at the whole point of this thing is once you've trained it to inspect lots of wafers. And so it turns to that issue and then it talks in those terms, right? Are there any other questions on the wafer construction issue? On the facts, I'll just point out a couple of things on the facts there. If we did decide, contrary to what you wish, that the plurality of wafers has to be several discrete wafers or more than one discrete physical substrate, what should happen? I mean, they're arguing that that's a reversal then. But I think that you argue that there's a significant amount of evidence that might demonstrate that the Falcon device still performs and causes infringement even under a different construction. Exactly. So what would you have us do if we did go that way? Well, I think it is a harmless error because I don't think they rebutted our showing that their own expert, Mr. Meller, admitted that their machine creates a model, at least initially, with a wafer number one, but then also has a wafer number two that puts into it. Now, he said it refines the model, but he admitted that what that means is on a pixel-by-pixel basis, which is what this training model is, you have a range from zero to 256. Zero is pure white, 256 is pure black. And that second wafer, it continues to train with that and modify the minimum and maximum values for each pixel. It's modeling. It's creating that model using multiple wafers. Well, why isn't that a jury question? Well, because there's no evidence on either side of it at this point. Their own expert admitted that. Ours did, too. No, but the expert admitted what happened, but couldn't a reasonable jury agree with the refinement argument and determine that they only use a single wafer? I think that when they admit that the second wafer actually modifies the minimum and maximum values for each pixel, that's what the model is, is providing minimum and maximum values for each pixel. Well, but that's your argument. The jury here under Judge Moore's hypothetical was given the wrong instruction. Under a proper instruction, why couldn't they reach a conclusion of non-infringement? Well, I just look at that evidence when both experts agreed on what the CamTech Falcon machine was actually doing there. It did have that. And keep in mind that the claims actually aren't claiming wafer as an element. The word wafer comes up indirectly. It's a visual inspection device for getting visual inputs of multiple wafers. Their machine has that visual inspection device. It meets that limitation either way. Now, in a given situation, does somebody use it with one wafer or two wafers? Well, that's really not the issue, at least for the system claim of claim one. It's got the visual inspection device either way. If we were to modify the claim construction, that wouldn't affect validity that's on appeal. Is that correct? Because the claim construction issue goes only to the wafer concept, and the issue on appeal is about the strobing. So that's different on the validity issue. I don't see why that would give any reason to disturb the validity finding here. That's right. I mean, they're just looking for a narrower construction. The validity wouldn't be helped for them if the claims were only narrower. On the on-sale bar issue, I believe that came up a little bit in the questioning as well. If you'd like, I could turn to that unless there's other issues. You're almost out of time. I'll be assigned. All right. Thank you. I think this would say it is a harmless error because we didn't bring up the evidence that there was experimental use. This was not developed until after, months after this purported order actually happens, the evidence here. There's a development process that started well after this order. It was just seed money. They haven't been able to deal with any of that in their replies. So we believe it is a harmless error. Okay. Thank you, Mr. McDonnell. Thank you. Mr. Kaplan. Thank you, Your Honors. I just want to point out initially one item that is an erroneous statement by Mr. McDonnell. Wafers and dyes are definitely different, as Your Honor pointed out. The terms are used differently. They have multiple embodiments in the patents. In the specification, they have claims directed. They knew how to use the different terms in different places when they wanted to. And I just want to point out that in the specification of the patent, this is JA-7483, it makes clear that the training and inspection process is the same. They talk about there's an alignment process that goes on,  So I don't see any basis that if there are claims directed to training on wafers or inspecting wafers, those are different than dealing with dyes. They had a choice to make as to how they claimed it. But it is very clear that to mix metaphors in terms of wafer and dye between training and inspection is not what they've claimed, and the specification talks about that. Now, the pizza example, or the analogy, I think is very apt, as we discussed in my initial comments. Everyone knows what a slice of pizza is. It's not multiple slices. I think that point has been clear, and our position has always been that whatever the wafer is, that's what it is. You cannot go back, emotionally, just keep changing it because you can find two or more dye on any particular substrate. Which leads me to another point I wanted to make. If you look at the claim language, and if you look at the preamble of the claim of Claim 1, this is on 7488 of the appendix, it talks about, in the preamble, an automated system for inspecting a substrate such as a wafer in any form, and it has the laundry list. But what I wanted to point out is it's a system for inspecting a substrate. This just goes back to this issue about talking about something that's physical and something that's physically discrete. A thin slice of semiconductor material is a substrate, and I think is well within the scope of what is claimed there. So please address Mr. MacDonald's contention that even if there was a mistake in the construction of wafer, that it's harmless error. And his second point, I think, is that you're not entitled to jamewall on that question because there was evidence that would support a jury verdict of infringement under the claim construction that you're urging. Okay. So, Your Honor, the issue is, and this is also in Claim 1, and the claim limitation at issue is visually, it talks about visual inspection of other, it says a visual inspection device for visual inputting of a plurality of non-good quality wafers and then doing a visual inspection. The issue that's been raised, the evidence that was put in, is that there are instances where certain data is updated over the course of operation of a machine. But the claim limitation, I think this is a problem I want to highlight briefly, is that there is a bit of a disconnect because they talk about different things here. This is all about, the claim language says visually inputting something. There is only one wafer that is visually inputted. There is no testimony below that the supplemental data that may come in over time on these pixel values, there is no visual inputting of that. There is no visual data, so I would submit that there is no basis for a jury to find that, in fact, the visual inputting limitation, which is what this relates to, would be met by some subsequent internal process that may happen. The other point I wanted to make in the time that I have left is that one of the things, and I think there is just a big disconnect, I know we highlighted this in our brief, is that a lot of the viewing of the evidence and the way the prior art has to be interpreted has to be looked in the context of what is actually claimed and described in this patent. We think there is a significant disconnect. There was testimony at trial that the things that really enabled this alleged invention to work were things like solving the effective inspection and the ability to do second optical in a particular way are things that aren't described, aren't claimed. They talk about solving a problem with prior art strobing, and all we see in the specification is nothing more than a description at best of the prior art strobes, the known illumination means. We don't see anything new there, and I think, I know it's in our brief, so I just want to highlight that that is a key issue as we are looking at what the claim describes. And when you look at the prior art, because the analysis where you are talking about what the prior art shows, the prior art shows exactly what they claim and describe, which is taking a patterned wafer and using strobing to do some form of inspection. What they said was necessary and what they argued to the jury to make it really work is not what they claim. That was the confusion that led to the problem, and I know our brief lays it out clearly. Thank you.